IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

RODERICK D. PARSONS, et al.,

        Plaintiffs,

v.                                   CIVIL ACTION NO.   2:19-cv-00649

COLUMBIA GAS TRANSMISSION, LLC,
et al.,

        Defendants.

**ORDER**

Plaintiffs Roderick D. Parsons, Jerry E. Cunningham, Belinda Cunningham, Bruce W. Cunningham, Annettea S. Fields, Kay M. Greathouse, and Kelvin M. Greathouse (collectively, "Plaintiffs") bring this purported class action against Defendants Columbia Gas Transmission, LLC ("CGT") and Columbia Pipeline Group, Inc. (collectively, "Defendants"), alleging claims for trespass, conversion, unjust enrichment, and inverse condemnation based on Defendants' use of their property for natural gas storage operations.  (ECF No. 45.)[1]  Before this Court is Plaintiffs' Motion for an *In Camera* Review of Allegedly Privileged Documents and to Compel Production of Non-Privileged Documents.  (ECF No. 105.)  Plaintiffs assert that CGT has improperly refused to produce responsive documents on grounds of attorney–client privilege and work product

---

[1] Eight additional plaintiffs named in the amended complaint have since voluntarily dismissed their claims against Defendants, although they remain part of the potential class of affected landowners.  (ECF Nos. 117, 118.)  This matter has also been consolidated with *Moles, et al. v. Columbia Gas Transmission, LLC, et al.*, No. 2:20-cv-00279, since the amended complaint was filed.  (ECF No. 77.)

protection. (ECF Nos. 105, 106.) For the reasons explained more fully herein, Plaintiffs' motion (ECF No. 105) is **GRANTED IN PART** and **DENIED IN PART**.

This Court's review of the withheld documents and the corresponding privilege log has revealed three broad categories of documents: email communications and letters, data tracking spreadsheets, and title abstracts and opinions. CGT has claimed both attorney–client privilege and work product protection apply to each withheld document. (*See* ECF No. 105-1 at 6–7.) It represents that the documents were created as part of an extensive project, termed the "Storage Initiative," to "perform a wholesale review of its title and rights to its storage fields in New York, West Virginia, and Pennsylvania" following litigation filed in Ohio in 2012 and 2014. (ECF No. 111 at 4; *see* ECF No. 111-1 at 2–3.) According to CGT, its in-house counsel developed the Storage Initiative and enlisted a small team of CGT employees to assist with the project, in addition to retaining outside counsel to "obtain[] and analyz[e] title opinions regarding [CGT's] rights and title to property within its . . . storage fields" and to institute condemnation litigation if necessary. (ECF No. 111 at 4–5; *see* ECF No. 111-1 at 3–4.) Plaintiffs, on the other hand, assert that the Storage Initiative is simply part of CGT's normal course of business due to its "statutory obligation to either purchase the property interests necessary to operate its storage fields or to file condemnation proceedings" to obtain those interests. (ECF No. 114 at 2; *see* ECF No. 106 at 2–3.) Contextual clues in the withheld documents demonstrate that the Storage Initiative is more than a routine annual review of CGT's holdings and that CGT intended to file condemnation litigation from the project's inception. As such, CGT has appropriately claimed attorney–client privilege and work product protection for most of the withheld documents.

2

### A. *Email Communications and Letters*

The majority of the withheld email communications and letters are shielded from disclosure by the attorney–client privilege; therefore, CGT has properly refused to disclose them to Plaintiffs. The attorney–client privilege "affords confidential communications between lawyer and client complete protection from disclosure." *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998).[2] In the most basic sense, it applies when there is a lawyer–client relationship between the individuals involved in the communication, the communication was made for the purpose of providing or securing legal advice or services, and the communication was intended to be confidential. *See id.* (quoting *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982)). "This privilege protects 'not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.'" *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 291 (4th Cir. 2004) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).

The attorney–client privilege applies with equal force when the client is a corporation or a related business entity. *See Upjohn Co.*, 449 U.S. at 389–90 (citing *United States v. Louisville & Nashville R.R. Co.*, 236 U.S. 318, 336 (1915)). To that end, it protects communications between a business's employees and its counsel when those communications "concern[] matters within the scope of the employees' corporate duties" and are made "in order that the corporation could obtain legal advice" from its counsel. *Id.* at 394; *see Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 376 (4th Cir. 2009) ("Where the client is an organization, the privilege extends to those communications

---

2 Although Federal Rule of Evidence 501 provides that "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision" in a civil case, the federal common law of privilege applies when, as here, the complaint alleges both state and federal claims. *Virmani v. Novant Health Inc.*, 259 F.3d 284, 286 n.3 (4th Cir. 2001).

3

between attorneys and all agents or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication." (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 (D.C. Cir. 1977))). This is true regardless of whether the attorney is outside counsel hired by the business or its own in-house counsel. *Johnson v. Ford Motor Co.*, Nos. 3:13-cv-06529, 3:13-cv-14207, 3:13-cv-20976, 2015 WL 5193568, at *2 (S.D.W. Va. Sept. 3, 2015) (quoting *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398, 411 (D. Md. 2005)).[3] The attorney–client privilege also protects communications between a company's employees relaying or seeking the lawyer's advice. *See Rein*, 553 F.3d at 377 (holding that intra-agency communications about information given to agency's counsel for litigation involving agency were privileged); *F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A.*, 184 F.R.D. 64, 71 (D. Md. 1998) ("The communications retain their privileged status if the information is relayed from a non-lawyer employee or officer to other employees or officers of the corporation on a need to know basis.").

The email communications and letters CGT has withheld are in large part quintessential examples of privileged conversations between lawyer and client. Some of them are requests from a CGT employee assigned to work on the Storage Initiative for advice from CGT's in-house or outside counsel and its counsel's corresponding instructions about how to proceed with various aspects of the project. Others are requests from CGT's in-house or outside counsel to its Storage Initiative employees for information about the project or for approval to act on CGT's behalf. CGT has appropriately withheld these email communications. It has likewise properly declined

---

3 Although at least two members of the team of Storage Initiative employees are licensed attorneys, it does not appear that they worked as in-house counsel for CGT. Therefore, for purposes of the instant motion, this Court has grouped them with the other Storage Initiative employees who are not licensed attorneys.

to produce letters from a Storage Initiative employee to CGT's outside counsel authorizing her firm to initiate condemnation proceedings.4

As to the email communications between CGT's employees, only those that convey directions or legal advice from in-house or outside counsel are protected by the attorney–client privilege. Importantly, "each email within a particular line of discussion must be analyzed separately for privilege purposes." *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 503 (4th Cir. 2011). And the fact that an email attachment may be privileged or work product does not insulate an otherwise unprotected email communication from disclosure. *See Johnson*, 2015 WL 5193568, at *4–*5 (holding that email communications between company's employee and in-house counsel were protected by attorney–client privilege, but attachments were not). The following email communications between CGT employees are not shielded from disclosure by the attorney–client privilege, but CGT may continue to withhold any email attachments: TC_PARSONS00043644, TC_PARSONS00043646, TC_PARSONS00043647, TC_PARSONS00043701, TC_PARSONS00043703, and TC_PARSONS00043705. In the email chain designated as TC_PARSONS00103611, TC_PARSONS00103626, TC_PARSONS00103642, TC_PARSONS00103658, TC_PARSONS00103674, TC_PARSONS00103690, TC_PARSONS00103706, TC_PARSONS00103858, and TC_PARSONS00103874, the December 17, 2018, January 3, 4, 7, and 18, 2019, and February 1, 4, 5, 15, and 18, 2019 email communications between CGT employees and the August 3, 22, and 23, 2018 email communications between CGT's outside counsel and

---

4 Two of these letters may be incorrectly identified as data tracking spreadsheets in CGT's privilege log. (*See* ECF No. 105-1 at 7.) This Court has evaluated each withheld document according to what it is as produced for *in camera* review, regardless of how it is described on the privilege log.

Plaintiffs' counsel are not protected by the attorney–client privilege, but CGT may redact the remainder of the email chain before producing those documents to Plaintiffs.

Plaintiffs emphasize the fact that CGT retained outside counsel, which in turn hired third-party title services, to prepare the title reports used to determine whether CGT needed to obtain additional property rights around its storage fields—work that Plaintiffs argue CGT's own employees could have done. (ECF No. 106 at 7–8; ECF No. 114 at 5.) But whether it was possible for CGT's employees to perform title research is immaterial, as CGT plainly employed outside counsel to evaluate its legal rights in its holdings, which inherently involves an examination of the sources of those rights. (*See* ECF No. 111-1 at 3.) "[F]act finding which pertains to legal advice counts as professional legal services." In re *Allen*, 106 F.3d 582, 603 (4th Cir. 1997) (quoting *United States v. Rowe*, 96 F.3d 1294, 1297 (9th Cir. 1996)).

And CGT's use of title services to prepare the title abstracts does not void the application of the attorney–client privilege to the email communications between CGT's employees, in-house counsel, and outside counsel and the title services' employees. When either the client or the lawyer utilizes a professional consultant in the course of seeking or providing legal services, a "derivative" attorney–client privilege protects those communications. *See Grand Jury Proceedings Under Seal v. United States*, 947 F.2d 1188, 1191 (4th Cir. 1991) (citing *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961)); *see also Williams v. Big Picture Loans, LLC*, 303 F. Supp. 3d 434, 446 (E.D. Va. 2018) (explaining "derivative" privilege). The title services are effectively "retained professionals" whose work assisted CGT's outside counsel "to better understand the facts in providing competent legal advice to [CGT]." *Flo Pac, LLC v. NuTech, LLC*, No. WDQ-09-cv-510, 2010 WL 5125447, at *5 (D. Md. Dec. 9, 2010) (citing *Kovel*, 296 F.2d at 921).

The email communications between CGT's employees, in-house counsel, and outside counsel and the title services that relay information related to the title abstracts and opinions provided to CGT and its outside counsel are shielded from disclosure by the attorney–client privilege. However, mere transmittal letters informing CGT and its outside counsel that documents had been uploaded to a cloud-based system for viewing are not privileged. *See Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*, No. 1:04-cv-00007-LMB, 2004 WL 3661433, at *4 (E.D. Va. Mar. 31, 2004) (affirming bankruptcy court's holding that fax transmittal sheets were not privileged because "the fact of transmittal of the documents [was not] confidential such that it implicated the attorney–client privilege"). The following email communications between CGT employees are not shielded from disclosure by the attorney–client privilege: TC_PARSONS00111835, TC_PARSONS00111859, TC_PARSONS00111893, TC_PARSONS00111911, TC_PARSONS00111922, TC_PARSONS00111945, TC_PARSONS00111967, TC_PARSONS00111986, TC_PARSONS00112005, TC_PARSONS00112012.[5] In the email chain designated as TC_PARSONS00043619, the July 20, 2016 email communication between an employee of a title service and CGT's outside counsel and the August 8, 2016 email communication between CGT employees are not protected by the attorney–client privilege, but CGT may redact the remainder of the email chain before producing the document. In the email chain designated as TC_PARSONS00043622 and TC_PARSONS00043634, the July 20, 2016 email communication between an employee of a title service and CGT's outside counsel and the August 8 and 9, 2016 email communications between CGT employees are not protected by the attorney–client

---

5 The invoices attached to these email communications were not provided for this Court's review. Should Plaintiffs desire the invoices to be produced, they are **ORDERED** to notify this Court within **seven (7) days** from the date CGT produces the email communications.

privilege, but CGT may redact the remainder of the email chain before producing those documents. In the email chain designated as TC_PARSONS00112725, the March 16, 2017 email communication between CGT employees is not protected by the attorney–client privilege, but CGT may redact the remainder of the email chain before producing the document.

The email communications and letters not specifically mentioned herein are shielded from disclosure by the attorney–client privilege and were properly withheld. As such, Plaintiffs' Motion for an *In Camera* Review of Allegedly Privileged Documents and to Compel Production of Non-Privileged Documents (ECF No. 105) is **GRANTED IN PART** and **DENIED IN PART** as to the email communications and letters.

B. *Data Tracking Spreadsheets*

The data tracking spreadsheets are entitled to work product protection, and CGT has appropriately declined to produce them to Plaintiffs. The work product doctrine shields "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)" from discovery absent a showing of "substantial need" and "undue hardship" by the requesting party. Fed. R. Civ. P. 26(b)(3)(A). Plaintiffs and CGT appear to agree that the data tracking spreadsheets are documents. (ECF No. 111 at 8; *see* ECF No. 106 at 8–9.) The spreadsheets were created by CGT's employees or employees of the title services on behalf of CGT, which is a party to this action. Therefore, only the second element of the work product doctrine—whether the data tracking spreadsheets were prepared with an eye toward litigation—is at issue.

A document is considered to have been "prepared in anticipation of litigation" if it is "prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992) (emphasis in original). "[M]aterials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes," by contrast, "are not documents prepared in anticipation of litigation within the meaning of Rule 26(b)(3)." *Id.* (citing *Goosman v. A. Duie Pyle, Inc.*, 320 F.2d 45, 52 (4th Cir. 1963)). "When a document can be used for both business and litigation purposes," it qualifies for work product protection when litigation is "'the driving force behind the preparation of' the document." *Ramaco Res., LLC v. Fed. Ins. Co.*, No. 2:19-cv-00703, 2020 WL 3547946, at *2 (S.D.W. Va. June 30, 2020) (quoting *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984). Key considerations in making this determination include "whether the document was created 'when litigation is a real likelihood' rather than 'merely a possibility' and whether the document would have been created in the same manner had there been no expectation of litigation." *Id.* (quoting *RLI Ins. Co. v. Conseco, Inc.*, 477 F. Supp. 2d 741, 747–48 (E.D. Va. 2007)).

The data tracking spreadsheets were conspicuously developed in order to assist CGT in filing condemnation litigation. One set of spreadsheets records the number of title reports that were ordered for CGT's storage fields and summarizes action items to be completed before condemnation actions could be filed. Another set reflects CGT's progress toward obtaining title reports for each of its storage fields. Still others demonstrate a title service's progress toward providing title reports to CGT and document CGT's requests for clarification or revisions for some of those title reports. A final set of

9

spreadsheets, some of which are computer printouts of spreadsheet files, details the progress of CGT's negotiations with each property owner in a particular storage field. Plaintiffs argue that because CGT is statutorily required to first attempt to secure an agreement with the landowner prior to filing a condemnation action, these data tracking spreadsheets are examples of ordinary business activities, rather than litigation preparation. (ECF No. 106 at 8–10; ECF No. 114 at 6–15.) But the fact of this requirement actually supports CGT's position: negotiations with landowners are a necessary prerequisite to a successful condemnation action and, in that sense, are an element of a condemnation claim. *See Dominion Energy Transmission, Inc. v. 0.11 Acres of Land*, No. 1:19-cv-182, 2019 WL 4781872, at *3 (N.D.W. Va. Sept. 30, 2019) ("[T]o establish that it has the right to condemn, Dominion must demonstrate only that (1) it holds a FERC Certificate, (2) it needs to acquire the easements, and (3) it has been unable to acquire them by agreement." (citing 15 U.S.C. § 717f(h))); *Mountain Valley Pipeline, LLC v. Easement to Construct, Operate & Maintain 42-Inch Gas Transmission Line*, No. 2:17-cv-04214, 2018 WL 1004745, at *6 (S.D.W. Va. Feb. 21, 2018) (granting summary judgment to plaintiff as to its "power of eminent domain" because "[i]t is undisputed (1) that [plaintiff] holds a certificate, (2) that the property interests [it] seeks to condemn are necessary for its FERC-approved project, and (3) that [plaintiff] has unsuccessfully negotiated those property interests with the landowners").

Plaintiffs attempt to compare CGT's statutory and regulatory obligation to an insurance company's duty to investigate claims made by its insureds. (ECF No. 106 at 10; ECF No. 114 at 14–15.) This argument ignores the clear delineation between an insurance company's investigation prior to its denial of a claim and its actions afterward, which are generally entitled to work product protection because litigation is expected.

10

*See Westfield Ins. Co. v. Carpenter Reclamation, Inc.*, 301 F.R.D. 235, 250 (S.D.W. Va. 2014). Moreover, an insurance company's investigation of a claim is not at all like CGT's Storage Initiative. Plaintiffs point out that CGT conducted routine annual evaluations of its holdings and contend that the principal goal of the Storage Initiative project was to correct "deficiencies" in CGT's property rights. (ECF No. 114 at 6–15.) But the withheld documents show that the Storage Initiative was not merely a standard yearly task but was a large-scale, extensive undertaking that CGT fully projected to result in condemnation litigation from the outset. CGT's retention of outside counsel to assist with the Storage Initiative illustrates its scope. And the fact that Plaintiffs received the notices that led them to file this action as a result of the Storage Initiative is perhaps the most obvious clue that the project is largely unrelated to CGT's annual review of its leases. Plaintiffs also suggest that the work product doctrine only protects documents within the context of the litigation for which they were purportedly created (ECF No. 106 at 9), but that is plainly not correct, *FTC v. Grolier Inc.*, 462 U.S. 19, 25 (1983) ("[T]he literal language of [Rule 26(b)(3)] protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation." (emphasis in original)); *Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 487 F.2d 480, 483 (4th Cir. 1973) ("[W]e find no indication that the [United States Supreme] Court intended to confine the protection of the work product to the litigation in which it was prepared or to make it freely discoverable in a subsequent law suit.").

Notably, it is apparent that Plaintiffs believe the data tracking spreadsheets contain information that simply is not there. It is unclear how a spreadsheet detailing, for example, the number of title reports that were ordered and had been received from the

11

title service has any bearing on Plaintiffs' claims in this lawsuit.[6] Such data is surely not the "evidence of intentional trespass" Plaintiffs urge it to be. (ECF No. 106 at 13.) Nor do the data tracking spreadsheets include information about CGT's valuation of any particular property rights or suggestions for amounts to offer landowners in negotiation, unlike the information the Ninth Circuit stated should be disclosed in *United States v. Meyer*, 398 F.2d 66, 70 (9th Cir. 1968),[7] which Plaintiffs cite in their briefs (ECF No. 106 at 9 & n.2; ECF No. 114 at 14). However, to the extent any of the data tracking spreadsheets are simply data from CGT's computerized maps that has been exported to Excel format—a proposition this Court finds unlikely, if not doubtful—that data is not protected work product because it was not created principally for CGT's use in condemnation litigation.

In sum, Plaintiffs' Motion for an *In Camera* Review of Allegedly Privileged Documents and to Compel Production of Non-Privileged Documents (ECF No. 105) is **GRANTED IN PART** and **DENIED IN PART** with respect to the data tracking spreadsheets. More specifically, CGT has appropriately withheld all of the data tracking spreadsheets except for any that are nothing more than Excel-format data exports from its computerized maps.

C. *Title Abstracts and Opinions*

The title abstracts and opinions are also entitled to work product protection, for essentially the same reasons as the data tracking spreadsheets. Like the data tracking

---

6 For that reason, Plaintiffs have not demonstrated the "substantial need" necessary for this Court to order production of the data tracking spreadsheets. *See Nat'l Union Fire Ins. Co.*, 967 F.2d at 985 ("With regard to *other* documents falling within the scope of Rule 26(b)(3), the court must determine whether the requesting party has a substantial need for them, taking into account their relevance and importance and the availability of the facts from other sources." (emphasis in original)).

7 If the *Meyer* case had been filed more recently, the appraisal reports the government sought to exclude as work product likely would have been part of its Federal Rule of Civil Procedure 26(a)(2) expert disclosures. Expert disclosures would not be required for another twenty-five years after *Meyer* was decided. Fed. R. Civ. P. 26(a) advisory committee's note to 1993 amendment.

spreadsheets, the title abstracts and opinions are documents that were prepared for CGT's benefit by various title services hired by CGT's outside counsel. And like the data tracking spreadsheets, the title abstracts and opinions that have been withheld were created primarily to assist CGT in filing condemnation litigation. To institute such litigation, CGT needed to ensure it had accurate information about the property interests it sought to obtain, and the title abstracts and opinions were intended to provide that. Even Plaintiffs admit that title abstracts and opinions "are a prerequisite for Defendants to pursue a condemnation proceeding." (ECF No. 106 at 11.)

Nonetheless, a party may obtain documents that are otherwise entitled to work product protection if it "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). Put simply, the work product doctrine "is little more than an 'anti-freeloader' rule designed to prohibit one adverse party from riding to court on the enterprise of the other." *Nat'l Union Fire Ins. Co.*, 967 F.2d at 985. This "policy . . . may be outweighed by a showing based on the document's relevance and importance to the issues in the litigation and the unavailability of facts in the documents from other sources." *Id.* Plaintiffs argue that they need the title abstracts and opinions to establish their ownership of their property and that they are unable to "obtain equivalent materials without great expense, which would far outweigh the amount offered to them in compensation." (ECF No. 106 at 11; ECF No. 114 at 15–16.) But as CGT points out, the chains of title for Plaintiffs' properties are publicly available. (ECF No. 111 at 17.) If Plaintiffs believe that hiring a title service to perform the research is prohibitively expensive, the option exists to do the work themselves at a lesser cost. Ultimately, Plaintiffs bear the burden to offer evidence to prove the elements of their

spreadsheets, the title abstracts and opinions are documents that were prepared for CGT's benefit by various title services hired by CGT's outside counsel. And like the data tracking spreadsheets, the title abstracts and opinions that have been withheld were created primarily to assist CGT in filing condemnation litigation. To institute such litigation, CGT needed to ensure it had accurate information about the property interests it sought to obtain, and the title abstracts and opinions were intended to provide that. Even Plaintiffs admit that title abstracts and opinions "are a prerequisite for Defendants to pursue a condemnation proceeding." (ECF No. 106 at 11.)

Nonetheless, a party may obtain documents that are otherwise entitled to work product protection if it "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). Put simply, the work product doctrine "is little more than an 'anti-freeloader' rule designed to prohibit one adverse party from riding to court on the enterprise of the other." *Nat'l Union Fire Ins. Co.*, 967 F.2d at 985. This "policy . . . may be outweighed by a showing based on the document's relevance and importance to the issues in the litigation and the unavailability of facts in the documents from other sources." *Id.* Plaintiffs argue that they need the title abstracts and opinions to establish their ownership of their property and that they are unable to "obtain equivalent materials without great expense, which would far outweigh the amount offered to them in compensation." (ECF No. 106 at 11; ECF No. 114 at 15–16.) But as CGT points out, the chains of title for Plaintiffs' properties are publicly available. (ECF No. 111 at 17.) If Plaintiffs believe that hiring a title service to perform the research is prohibitively expensive, the option exists to do the work themselves at a lesser cost. Ultimately, Plaintiffs bear the burden to offer evidence to prove the elements of their

claims, including in the most basic sense proof of their ownership of the property they allege Defendants have used unlawfully. CGT has effectively done this already, as Plaintiffs seem to acknowledge. (ECF No. 106 at 11.) But the very purpose of the work product doctrine is to prevent one party from making its case with the opposing party's efforts. *Nat'l Union Fire Ins. Co.*, 967 F.2d at 985 (quoting Fed. R. Civ. P. 26(b) advisory committee's note to 1970 amendment). This is not to say that Plaintiffs are not entitled to discovery about Defendants' "knowledge about the land rights that [they] do[] and do[] not hold." (ECF No. 114 at 16.) However, it would seem that there are methods to uncover this information without use of CGT's work product. Accordingly, Plaintiffs' Motion for an *In Camera* Review of Allegedly Privileged Documents and to Compel Production of Non-Privileged Documents (ECF No. 105) is **DENIED** as to the title abstracts and opinions.

For the foregoing reasons, Plaintiffs' Motion for an *In Camera* Review of Allegedly Privileged Documents and to Compel Production of Non-Privileged Documents (ECF No. 105) is **GRANTED IN PART** and **DENIED IN PART**. CGT is **ORDERED** to provide the documents to Plaintiffs as set forth herein within **fourteen (14) days** from the date of this Order.

**IT IS SO ORDERED**.

The Clerk is **DIRECTED** to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: May 11, 2021

Dwane L. Tinsley
United States Magistrate Judge