**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

RODERICK D. PARSONS, et al.,

               Plaintiffs,

v.

COLUMBIA GAS TRANSMISSION, LLC,
et al.,

               Defendants.

CIVIL ACTION NOs.  2:19-cv-00649;
2:20-cv-00279 (*consolidated*)

**MEMORANDUM OPINION AND ORDER**

This putative class action is now before the Court on two motions: (1) the *Motion to Certify Class Action* (ECF No. 194) filed by Plaintiffs, and (2) the *Motion to Strike Plaintiffs' Expert* (ECF No. 202) filed by Defendants (collectively, "Defendants" or "Columbia"), which are referred to the undersigned for disposition by consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (ECF Nos. 19, 20, 77.) For the reasons set forth herein, both motions are **DENIED**.

*I.*

**a.**    **Allegations**

This action concerns Columbia's storage of surplus natural gas in underground "storage fields" in 12 different locations within West Virginia, which have been assigned the following names: Hunt, Ripley, Coco A, Coco B, Coco C, Glady, Lanham, Rockport,

Terra Alta, Terra Alta South, Victory A, and Victory B. (ECF No. 45 at 6.) The consolidated Plaintiffs are landowners who allege that, "[b]y information and belief," they own interests in real property located within the boundaries of either the "Ripley" or "Hunt" storage fields.[1] (ECF No. 194.) These storage fields are "naturally occurring geologic formation[s] consisting of porous and permeable rock formations existing below [ground]." (ECF No. 45 at 5.) When the demand for natural gas is low, Defendants inject natural gas into these underground storage fields, and the natural gas is withdrawn when demand is high. *Id*. at 6. *See* Joseph A. Schremmer, *Pore Space Property*, 2021 Utah L. Rev. 1, 7-8 (2021) (discussing what underground pore space is and why it is used for natural gas storage).

The authority for qualifying entities like Columbia to operate these storage fields derives from the Federal Energy Regulatory Commission ("FERC"), which may issue a "certificate of public convenience and necessity" and designate each storage field's boundaries and surrounding "buffer" zones. (ECF No. 45 at 7-8.) Plaintiffs allege that upon issuance of this certificate, the qualifying entity must also negotiate agreements with all parties who own the land—and/or the mineral/gas rights and/or gas storage rights to the land—within the boundaries *and* "buffer" zone over which the storage fields are located, for the right to use the property as part of the storage field. *Id*. at 6-8. If an agreement cannot be reached, the qualifying entity may use eminent domain authority

---

[1] On September 4, 2020, District Judge Irene C. Berger consolidated the instant action with the "essentially identical" case styled *Moles et. al.  v. Columbia Gas Transmission, LLC, et. al.*, Civil Action Number 2:20-cv-00279, explaining that "[t]he sole difference between the two cases is location: the named Plaintiffs in *Parsons* own property impacted by the Ripley Storage Field, and the named Plaintiffs in *Moles* own property impacted by the Hunt Storage Field in or near Elkview," West Virginia. (ECF No. 77.) On December 23, 2020, the Court granted Plaintiffs' motion to voluntarily dismiss eight other Plaintiffs without prejudice, leaving twelve Plaintiffs remaining: Roderick D. Parsons, Jerry E. Cunningham, Belinda Cunningham, Bruce W. Cunningham, Annettea S. Fields, Kay M. Greathouse, Jacob Somerville, Kelvin M. Greathouse, Gary Moles, Victoria G. Moles, Laura Chapman, and Jeffrey Tignor (collectively, "Plaintiffs"). (ECF Nos. 117, 118.)

granted under the Natural Gas Act ("NGA"), 15 U.S.C. § 717, *et seq.*, to use the property in exchange for "just compensation." (ECF No. 45 at 9.)

The controversy in this matter arises from Plaintiffs' allegation on their "information and belief"[2] that their land sits within the boundaries of the Hunt or Ripley storage fields, that they have not reached an agreement with Columbia regarding the use of their property, and that Columbia has not acquired the right to use Plaintiffs' property through the eminent-domain proceedings as set forth in 15 U.S.C. § 717f(h). (ECF No. 45 at 9-10.) As a result, Plaintiffs allege that "Columbia has knowingly and wrongfully taken Plaintiffs' property without paying just compensation." *Id.* at 9. Plaintiffs further assert that in the process of withdrawing injected gas from the Hunt and Ripley storage fields, Columbia also removed some quantity of the "native" gas that pre-existed its injection of storage gas, without paying just compensation. *Id.* at 6.

On May 19, 2020, the *Amended Class Action Complaint* (the "complaint") became the operative pleading in this case. (ECF No. 45.)[3] The complaint alleges claims for trespass (count one); conversion (count two); unjust enrichment for the use of property for storage and withdrawal of native gas without compensation (counts three and four, respectively); inverse condemnation (count five); a declaratory judgment that Plaintiffs and the class members are entitled to compensation for Defendants' use of the storage

---

[2] The boundaries of Columbia's twelve storage fields in West Virginia are not publicly available, and were allegedly inaccessible to Plaintiffs prior to the filing of this action. Additionally, on review of the record evidence, the identity of entities who own the property rights to parcels of land within the corresponding boundaries—and indeed, the identity of which parcels which fall within the storage field and "buffer" zone—remain murky.

[3] Similarly, the *Second Amended Class Action Complaint* became the operative pleading in the consolidated *Moles* action on July 23, 2020. *See Moles et. al. v. Columbia Gas Transmission, LLC, et. al.*, Civil Action Number 2:20-cv-00279, at ECF No. 25 (S.D. W. Va. July 23, 2020). Because the allegations in these consolidated matters are substantively identical with the exception of the locations of the storage fields, the undersigned's citations to the complaint in the case at hand also refers *Moles* by reference.

field situated on the land at issue (count six), and a permanent injunction "preventing Columbia from using their properties to store natural gas and from taking their native natural gas unless and until Columbia" provides compensation (count seven). Plaintiffs also request compensatory and punitive damages. (ECF No. 45 at 19.)

### b.    Certification Request

In their October 1, 2021 motion to certify, Plaintiffs propose the following class:

> All persons or entities who own the surface of real property in West Virginia or who hold oil and/or gas mineral rights (fee or leasehold) to real property in West Virginia that is located within the certificated geographic boundaries of a Columbia gas storage field in West Virginia, which is not subject to a lease, easement, deed, or court order granting storage rights, as of the date of any order certifying the class.

(ECF No. 194 at 6.) Notably, the proposed class extends to owners of applicable property rights for all twelve West Virginia storage fields, though Plaintiffs purport to own property rights for the Hunt and Ripley storage fields only.

Further, Plaintiffs argue that "[w]hile there are overarching issues common to the entire class," they specifically seek "to prosecute the classes on behalf of two potential subclasses." *Id.* at 6. These "subclasses" are defined by Plaintiffs as the following:

> (a) All persons or entities who own the **surface** of real property in West Virginia that is located within the certificated geographic boundaries of a Columbia gas storage field in West Virginia, which is not subject to an existing lease, easement, deed, or court order granting storage rights, as of the date of any order certifying the class.

> (b) All persons or entities who hold **oil and/or gas mineral rights** (fee or leasehold) to real property in West Virginia that is located within the certificated geographic boundaries of a Columbia gas storage field in West Virginia which is not subject to an existing lease, easement, deed, or court order granting storage rights, as of the date of any order certifying the class.

*Id.* at 6-7 (emphasis in original). Plaintiffs also "except" from the class definition the following:

(c) Excluded from the classes are officers and agents of any defendant or subsidiary of any defendant or subsidiary of any defendant named in these lawsuits or any lawsuit involving the same or similar claims as those alleged in this lawsuit; any attorney for any such defendant; any attorney for any plaintiff in this lawsuit or in any lawsuit involving the same or similar claims as those alleged in these lawsuits against any such defendant; any judicial officer who presides over this lawsuit or over any other lawsuit involving the same or similar claims as those alleged in these lawsuits against any such defendant.

*Id*. at 7. Finally, Plaintiffs request that they be appointed as class representatives, and that their counsel be appointed as class counsel. *See id.*

## *II.*

### a. **Governing Standards**

#### 1. *Daubert* Standard

Rather than making a final admissibility determination, the Court "evaluates expert opinions at this stage" under Rule 702 of the Federal Rules of Evidence "only to the extent they are germane to the issue of class certification." *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 286 (S.D. W. Va. 2015). With that purpose in mind, the Court is to consider admissibility of an expert's opinion under Rule 702, which is assessed in two steps. The first step determines the threshold question of whether the expert is "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In assessing a proffered expert's qualifications, the district court must "'consider the proposed expert's full range of experience and training,' not just [his or her] professional qualifications." *Good*, 310 F.R.D. at 282 (citing *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012)). While relevant qualifications are crucial, an expert "need not be precisely informed about all details of the issues raised in order to offer an opinion." *Good*, 310 F.R.D. at 282 (citing *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791 (4th Cir.1989)).

Once qualified, in the next step the Court evaluates four factors: (1) whether "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) whether "the testimony is based on sufficient facts or data;" (3) whether "the testimony is the product of reliable principles and methods;" and (4) whether "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d); *see United States v. McLean*, 715 F.3d 129, 144 (4th Cir. 2013). In other words, the evidence is admitted if "it rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597, (1993). Relevance and reliability are guided by, among other things:

> (1)     whether the particular scientific theory "can be (and has been) tested;"
>
> (2)     whether the theory "has been subjected to peer review and publication;"
>
> (3)     the "known or potential rate of error;"
>
> (4)     the "existence and maintenance of standards controlling the technique's operation"; and
>
> (5)     whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

*Good*, 310 F.R.D. at 282 (citing *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003)).

The Court "need not, however, consider all of these factors in lockstep fashion." *Good*, 310 F.R.D. at 282. "Neither Rule 702 nor case law establish a mechanistic test for determining the reliability of an expert's proffered testimony." *Id.* Rather, "'the test of reliability is flexible' and 'the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" *Good*, 310 F.R.D. at 282 (citing *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)). As the Court previously noted when considering a defendant's

challenge to expert testimony in the context of a plaintiff's motion to certify a class, "[t]he gatekeeping role exercised by the district court [pursuant to Rule 702] is a critical one." *Good*, 310 F.R.D. at 282. The Court in *Good* emphasized the importance of ensuring relevance and reliability "[i]nasmuch as "expert witnesses have the potential to be both powerful and quite misleading." *Id.* Thus, the Court's inquiry must focus on "the principles and methodology employed by the expert, not on the conclusions reached." *Id.*

### 2.   Class Action Standards

Rule 23 of the Federal Rules of Civil Procedure 23 sets the standard for class certification. Under Rule 23, class certification is a two-step process. First, the district court must find the following under Rule 23(a):

(1)   the class is so numerous that joinder of all members is impracticable;
(2)   there are questions of law or fact common to the class;
(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)   the representative parties will fairly and adequately protect the interests of the class.

*Long v. Nationstar Mortg. LLC*, No. 2:15-CV-01202, 2018 WL 1247479, at *9 (S.D.W. Va. Mar. 9, 2018) (citing Fed. R. Civ. P. 23(a)).

Second, the action must also fall within one of three categories of class actions described in Rule 23(b). *Long*, 2018 WL 1247479, at *10 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 344 (2011)). Relevant to this action, the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). "The matters pertinent to these findings include (A) the class members' interests in individually controlling the prosecution or defense of separate actions; [and] (B) the

extent and nature of any litigation concerning the controversy already begun by or against class members." *Id.*; *Long*, 2018 WL 1247479, at \*10.

Finally, in addition to satisfying the foregoing standards under Rule 23, the class must be ascertainable. *Good*, 310 F.R.D. at 284. As the Fourth Circuit Court of Appeals explained, "[i]n order to determine whether a class action is proper, the district court must determine whether a class exists and if so what it includes;" thus, "[a]lthough not specifically mentioned in the rule, the definition of the class is an essential prerequisite to maintaining a class action." *Id.* (citing *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976)). That settled principle of case law, in a nutshell, defines the concept of ascertainability. "In 2003, the long-implicit concept of ascertainability was expressly added to Rule 23, providing that '[a]n order that certifies a class action must define the class[.]'" *Good*, 310 F.R.D. at 284 (citing Fed. R. Civ. P. 23(c)(1)(B)).

A court has considerable discretion in certifying a class action, and the party seeking certification has the burden of proving compliance with Rule 23. *Long*, 2018 WL 1247479, at \*10 (citing *Monroe v. City of Charlottesville*, 579 F.3d 380, 384 (4th Cir. 2009); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006)). The Fourth Circuit has instructed district courts to give Rule 23 "a liberal rather than a restrictive construction" with the goal in each particular case to "best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *Long*, 2018 WL 1247479, at \*10 (citing *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003)). However, "'actual, not presumed, conformance' with Rule 23 is indispensable, and the district court must undertake a 'rigorous analysis' to ensure that all the Rule's requirements are satisfied." *Long*, 2018 WL 1247479, at \*10 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)).

Plaintiffs contend that they have met the Rule 23(a) prerequisites for class certification, and that that this action is appropriate for certification under Rule 23(b)(3). (ECF No. 194 at 7.) Alternatively, Plaintiffs request that the Court certify an issues class or classes pursuant to Rule 23(c)(4), which provides that "an action may be brought or maintained as a class action with respect to particular issues . . . [w]hen appropriate." Fed. R. Civ. P. 23(c)(4); *Good*, 310 F.R.D. at 283. *Id.*

### III.

### a.     Columbia's Motion to Strike Plaintiffs' Experts

Defendants' motion to strike seeks a determination by the Court that "the proffered opinions and testimony" of three of Plaintiffs' expert witnesses—Jessica Wright, David Burgoyne, and Daniel Selby—are "inadmissible" and therefore "should be stricken and excluded" in this consolidated action. (ECF No. 202 at 1, 5.) The Court finds that the relief sought by Defendants—a determination of admissibility—is improper *at this stage of the proceedings*. As Plaintiffs aptly pointed out, "it is the Court, and not a jury, that is reviewing the evidence at this stage," and therefore "in making a decision on class certification, it can consider evidence that would be inadmissible at trial." (ECF No. 208 at 2-3 (citing *Baxley v. Jividen*, 504 F. Supp. 3d 539, 543 (S.D. W. Va. 2020); *Brandriff v. Dataw Island Owners' Ass'n*, 9:07-cv-3361, 2010 WL 11534520, at \*6 (D.S.C. Aug. 6, 2010)).) *Good*, 310 F.R.D. at 286. Thus, the Court's role in assessing the experts' opinions is not to determine admissibility under Rule 702 of the Federal Rules of Evidence, but rather to "evaluate the appropriateness" of the experts' conclusions, "consider the disputed facts presented" by Plaintiffs and their experts, and "weigh the certainty of" the experts' conclusions to determine whether the experts' opinions are "sufficiently reliable." (ECF No. 208 at 2-3 (citing *Baxley*, 504 F. Supp. 3d at 543).) The Court therefore

**DENIES** Defendants' motion to the extent it seeks to strike the opinions of Plaintiffs' experts from the case based upon a final determination of admissibility. Rather, as part of its duty to perform a "rigorous analysis," the Court will consider the testimony and opinions of Plaintiffs' expert witnesses *at this stage of the case* for their reliability "to the extent they are germane to the issue of class certification." *Good*, 310 F.R.D. at 286.

Upon review, the Court finds that the opinion of Plaintiff's expert, Jessica Wright, is germane to class certification. Defendants' motion challenges the opinions of Ms. Wright, who is a geographic-information-system ("GIS") specialist.[4] (ECF No. 203 at 4.) Plaintiffs rely upon Ms. Wright's mapping of the storage fields as their evidence in support of the numerosity and ascertainability elements of class certification.[5] Her opinion purports to determine the surface *parcels* that correspond to portions of the storage fields in West Virginia for which Columbia purportedly still owes gas-storage compensation. (ECF No. 195 at 22; *see also* ECF No. 208 at 4 ("Plaintiffs offer Jessica Wright to graphically demonstrate how GIS mapping interfaced to current property records can *help* ascertain putative class members") (emphasis added).)

Columbia challenges the factual basis, methodology, and reliability of Ms. Wright's purported identification of the class. (ECF No. 203.) First, Columbia points out that the basis of Ms. Wright's opinion was her correlation of field maps of the storage fields to a spreadsheet of tax parcels, and that both the field maps and spreadsheet were produced by Columbia during discovery in this case. Columbia argues that these documents lack

---

[4] GIS is an acronym for "geographic information system," a specific type of electronic mapping technology that allows the user to layer data tied to geographic points; in contrast to a static map, GIS technology allows the user to view customizable combinations of data layers in a dynamic tool.

[5] As discussed below, Columbia does not dispute the numerosity element in this action; accordingly, the Court's analysis will focus upon Ms. Wright's opinion to the extent it is reliable and germane to the ascertainability element.

key indicia of reliability, pointing to Ms. Wright's admission that the maps were deficient in seven of nine of the "essential features" that "all maps created within a professional environment should have." Wright Report, at p. 4. Further, Columbia points to Ms. Wright's deposition testimony that she "had no way to verify the accuracy of information on those maps," and noted that they did not have clear dates associated with them. Wright Dep., at 15:3-12, 41:13-16. She even noted in her Report that the legends in the asset maps "did not match the data that was visually represented on the maps" and "did not give the reader a clear and consistent idea of what the maps were trying to demonstrate." Wright Report, at pp. 4, 6.

Further, Columbia argued that Ms. Wright's methodology in GIS correlation of a spreadsheet listing tax parcels provided by Columbia in discovery to maps created by a former Columbia employee was not reliable and was not based on sufficient facts or data. According to Columbia, Ms. Wright's deposition testimony showed that she did not analyze or verify the accuracy of any of the information on which she based her opinions by spot-checking the results of her work against any verifiable data, such as by checking her correlation against recorded deeds, or verifying whether there were easements or leases for any of the parcels listed on the spreadsheet. Wright Dep., at 1-12, 10-11, 39:16-19 (testifying that she was not able to determine the accuracy of the spreadsheets that she relied upon).

Finally, relying on a similar case within the Fourth Circuit, Columbia argues that the methodology Ms. Wright used was unreliable and insufficient given her testimony that additional steps were needed to actually identify all of the parcels whose owners—yet to be identified—comprised the proposed class. (ECF No. 203 at 4) (citing *Johnson v. Time Warner Entm't-Advance/Newhouse P'ship*, 2017 U.S. Dist. LEXIS 140424, *22

(D.S.C. 2017) (finding that the plaintiff "failed to meet his burden of demonstrating a class is ascertainable" based upon a GIS expert's opinion) [hereinafter the "*Time Warner* case"]). The trial court in the *Time Warner* case was not persuaded that GIS-source or related methodology would sufficiently "eliminate the need for physical examination of parcels or searches of public records." *Time Warner*, 2017 U.S. Dist. LEXIS 140424, at *48.

Plaintiffs seek to distinguish *Time Warner*, where plaintiffs' motion for class certification suggested that a class of 179,827 landowners had been identified, but their expert had merely *proposed* the use of GIS technology and had not actually undertaken the study. (ECF No. 208 at 8 (citing *Time Warner*, 2017 U.S. Dist. LEXIS 140424, at *14).) The *Time Warner* court found that the expert had truly only identified "people who at max *may* be in the class" or a "universe of potential claimants," and "substantial additional work was needed." *Time Warner*, 2017 U.S. Dist. LEXIS 140424, at *14.

The Court finds that, although the study was actually undertaken in this case, the ultimate ascertainability issue present in the *Time Warner* case is present here nonetheless, because Ms. Wright has only identified a "universe of potential claimants," and "substantial additional work [is] needed" to reliably identify the class. *Id.*

First, although Plaintiffs state in their motion for class certification that Wright has identified the class, they walk that back in their response to Columbia's motion and instead represent that "Wright's report and testimony demonstrate that the putative class members are ascertainable and have already been *partially* identified," except for those which are located "in the protective area/buffer," which Plaintiffs claim "can still be identified from Columbia's records, testimony of the witnesses and public data." (ECF No. 208 at 1 (emphasis added).) Plaintiffs further acknowledge that Wright's report merely

proposes a methodology to "*help* ascertain" these "putative class members." (ECF No. 208 at 4 (emphasis added).) Further, just like the expert in *Time Warner*, here Plaintiffs specifically admit that Wright analyzed the discovery documents "to determine *how* unacquired parcels . . . *could* be identified and tracked." *Id.* at 5 (emphasis added). Importantly, Ms. Wright only identifies the *parcels* that Plaintiffs allege fall within the storage field; the identity of the landowners as well as mineral-rights owners (which may differ) remain largely unidentified. For instance, the land deed conveying property to Plaintiff Jacob Somerville states that "[t]his conveyance is made subject to all oil, gas and mineral reservations as made by predecessors in the chain of title and to all valid existing rights of way and easements appearing of record." (ECF No. 204-9 at 3.) This deed does not, however, identify to whom such "oil, gas and mineral reservations," if any, were made. Like the *Time Warner* expert, therefore, the ownership must still be determined from this universe of parcels. *Time Warner*, 2017 U.S. Dist. LEXIS 140424, at *47.

The Court agrees with Defendants that nothing in Ms. Wright's report or testimony eliminates the need for the individual examination of parcels or searches of public records. *See id.*  Plaintiff's proposed class definition invites factfinding on a parcel-by-parcel basis, regardless of what Ms. Wright's maps indicate. Further, in order to prove Plaintiffs' trespass claim, proof of entry is necessitated, so additional analysis regarding whether each property has actually been burdened will be required in the same way physical examination of the properties was required in *Time Warner* in order to determine whether any cable facilities fell within the parcel boundaries and outside of any easement areas. *See id.* at *18-19.

On this basis, therefore, the Court finds that Ms. Wright failed to demonstrate that her opinions would be useful to the factfinder to the extent Ms. Wright offers an opinion

on ascertaining or identifying the putative class members themselves, as opposed to the universe of parcels that they own. The court is mindful that "[s]crutiny of expert testimony is especially proper where it consists of an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *See Good*, 310 F.R.D. at 290 (citing *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.2d 137 (4th Cir.1994)).

Plaintiffs next try to liken this case to other cases wherein a class was certified because the putative class consisted of identifiable landowners in a "defined geographic area." ECF No. 208, pp. 8-9. The cases cited by Plaintiffs are all distinguishable, however, either as: (1) mass tort-related claims based on exposure in which geographic proximity to a polluter or event forms the basis of the class definition; or (2) arising from putative class definitions based on existing and readily-identifiable contracts. The putative class definitions in the cases cited by Plaintiffs simply do not require the same parcel-by-parcel inquiry or necessitate the individualized review of thousands of title documents containing differing and diverse conveyance languages required by Plaintiffs' putative class definition in this case.

For example, in the *Bell* case cited by Plaintiffs, the class simply included property owners or *mere residents* within a half-mile radius of a specific mill that caused large amounts of wood dust to invade those properties. *See Bell v. WestRock CP, LLC*, 2019 U.S. Dist. LEXIS 71209, *13 (E.D. Va. 2019) (defining the putative class as "[a]ll persons, who on December 15, 2017, owned ***or occupied*** property in West Point located one-half (0.5) mile or less from 200 14th Street in West Point, Virginia, ***or rented and occupied property***") (emphasis added). Unlike *Bell*, the putative class definition in the present case goes beyond a mere determination of geographic proximity. Plaintiffs' proposed

putative class definition as stated in their motion for class certification specifically requires a preliminary determination of title as to surface and mineral ownership and the applicability of other land rights instruments, including leases, easements, deeds, or court orders:

> All persons or entities who **own the surface of real property in West Virginia or who hold oil and/or gas mineral rights (fee or leasehold)** to real property in West Virginia that is located within the certificated geographic boundaries of a Columbia gas storage field in West Virginia, which is **not subject to a lease, easement, deed, or court order granting storage right**s, as of the date of any order certifying the class.

*See* ECF 194, ¶ 12 (emphasis added). Further, it does not simply cover a half-mile radius, but allegedly thousands of acres in eleven different storage fields. Plaintiffs' claims in this case necessarily require a case-by-case analysis of title and a determination of ownership as to different bundles of rights to each parcel, and are therefore distinguishable from the tort nuisance claim in *Bell*. The *Bell* court noted as much, acknowledging that the proposed class in *Bell* was ascertainable because, in contrast to the *Johnson* and *Kansas City Southern* cases relied upon by the defendants in that case, *Bell* would not require "individualized review of thousands of title documents containing differing and diverse conveyance language, to determine the intention of the parties to the conveyances and the legal effect of the instruments." *See Bell*, 2019 U.S. LEXIS at *15. It is clear on the face of Plaintiffs' own putative class definition, and from the issues identified with respect to various named Plaintiffs' membership, or lack thereof, in the putative class, *see* ECF No. 204 at pp. 10-17, that this case would, in fact, require an individualized review of thousands of title documents containing differing and diverse conveyance language to determine the legal effect of such instruments. Accordingly, *Bell* and other mass tort cases

involving class definitions based on geographic proximity are distinguishable and not applicable here.

The remaining cases cited by Plaintiffs are distinguishable as involving class definitions based on a universe of parties to readily identifiable existing contracts. For example, in *Barfield*, the Court noted that the putative class depends on neither "preliminary questions of the real property rights retained by individual class members," nor multiple types of land rights instruments, such as various right-of-way agreements, statutes, federal land grants, or private conveyances. *Barfield v. Sho-Me Power Elec. Co-op.*, 2013 U.S. Dist. LEXIS 103997, *24-25 (W.D. Mo. 2013). Instead, that case dealt with class members in a specific area who conveyed land to the defendants primarily through private easements with largely uniform language, and which "plaintiffs had already categorized into seven workable categories." *See id.* at *25. In *H& T Fair Hills, Ltd. v. All. Pipeline L.P.*, 2021 WL 2526737, *5 (D. Minn. 2021), also relied upon by Plaintiffs, the claims at issue were based in breach of contract and the putative class was defined as "all persons or entities who held or hold a land interest on Defendant's Pipeline Right of Way and who, since 2014, were or are eligible for crop loss compensation ***pursuant to Easements or Agricultural Impact Mitigation Agreements***." *See id.* (emphasis added).

In this case, however, Plaintiffs' claims are not based in breach of contract. There are no allegations that the Defendants exceeded the scope of existing easements. Instead, Plaintiffs' claims are based on the alleged *absence* of a contract or other acquisition of rights by Columbia. As a result, this case completely depends on "preliminary questions of the real property rights retained by individual class members" and various land rights instruments. In fact, this case involves the type of proposed class definition that the

*Barfield* Court specifically distinguished its case from. *See Barfield*, 2013 U.S. Dist. LEXIS at *21 (distinguishing *Barfield* facts from cases denying class certification where "inquiries involve[d] investigations of class members' fee titles as well as the instruments conveying land to the railroads, which could be in the form of federal or state grants, private conveyances, land condemnation proceedings, or even American Indian treaties in some cases" and acknowledging that "most courts have determined that the individual issues presented by these railroad cases defeat the typicality and/or predominance requirements of 23(b)(3) class certification."). Accordingly, *Barfield* and *H & T Fair Hills, Ltd.*, are not applicable here.

Lastly, Plaintiffs claim that any title disputes can be settled as part of claims administration, but this is also inappropriate in this case. *See* ECF No. 208, p. 9. The extensive individualized title questions related to each unique property in the storage fields at issue are included in, and directly tied to, the class definition proposed by Plaintiffs and any disputes related to those questions will require resolution by the trier of fact in this case. These predominating individual issues go to the heart of identification of the putative class in this case, which is exactly why the admissibility of Wright's proffered opinions and testimony as to the purported identification of the class is crucial at the class certification stage.

Additionally, given that Wright's opinions and testimony raise serious issues regarding the sufficiency of her supporting facts and methodology, therefore, the Court will take this into account in evaluating whether the Plaintiffs have established the numerosity and ascertainability elements of class certification. The court reserves the

question of whether, at a later date, Ms. Wright's GIS expertise could be helpful to a trier of fact in determining Plaintiffs' claims of ownership.[6]

### b. Motion for Class Certification

In evaluating Plaintiffs' motion for class certification, the Court examines satisfaction of the Rule 23(a) and 23(b)(3) factors in the first two steps of its analysis, turning thereafter to the issue of whether the class is ascertainable as required pursuant to Rule 23(c)(1)(B). Finally, the Court addresses the required Rule 23(c)(4) analysis surrounding Plaintiffs' proposed issue certification. For the reasons set forth herein, Plaintiffs have failed to establish all of the required elements set forth in Rule 23, and therefore their *Motion to Certify Class Action* (ECF No. 194) is **DENIED**.

### 1.    Step One: Rule 23(a) Elements

### i.    Numerosity

As an initial matter, Defendants concede that Plaintiffs' claims meet the numerosity element of Rule 23(a)(1), which requires that a class must be "so large that the joinder of all members is impracticable. Fed. R. Civ. P 23(a)(l). The Fourth Circuit has recognized that where the class numbers twenty-five or more, joinder is usually impracticable. *Kay Co., LLC v. EQT Prod. Co.,* No. l :13-CV-151, 2017 WL 10436074, at *8 (N.D.W. Va. Sept. 6, 2017) (citing *Cypress v. Newport News General & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 653 (4th Cir. 1967) to find eighteen class members sufficient).

---

[6] Based upon her testimony that she is not a title analyst and cannot provide expertise in determining who owns real property or whether a lease or easement applies to a property, Defendants also challenge in passing Ms. Wright's qualification to analyze the ownership rights of the properties at issue, asserting that expertise in title analysis specifically is required to determine which parcels are at issue in this case. (ECF No. 203 at 12 (citing Wright Dep. at 21.) The Court does not find support for Defendants' overly narrow qualification requirement. As discussed below, GIS mapping was inadequate under the specific circumstances of this case because the supporting data lacked indicia of reliability; the Court makes no finding that Ms. Wright's testimony hinges upon expertise in title analysis.

The Fourth Circuit has further held that "district courts have wide discretion in deciding whether or not to certify a class and their decisions may be reversed only for abuse of discretion." *Gunnells,* 348 F.3d at 424 (internal quotations omitted). Where, as here, Columbia admits that there are in excess of 25 property owners in the Ripley Storage Field alone, and an unknown number of additional mineral owners—in addition to the eleven other storage fields (*see* Columbia's Supp. Answers to Plaintiffs' Request for Admission, No. 99)—the numerosity requirement is easily satisfied under Rule 23(a)(1).

ii.   Commonality

Rule 23(a)(2) requires that Plaintiffs establish there are questions of law or fact common to the class. In other words, Plaintiffs must prove that the claims of the proposed class members "depend upon a common contention" that is "capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In order for a "contention" to constitute a "common question," it must yield the same answer with respect to each member of the proposed class. *Id.* (stating that a "common contention" is "capable of classwide resolution" if the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"). "What matters to class certification . . . is not the raising of common 'questions'—even in droves— but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *See id.* A common question is one that can be resolved for each and every class member in a single hearing. *See Thorn*, 445 F.3d at 319. A question is not common "if its resolution turns on a consideration of the individual circumstances of each class member." *Thorn*, 445 F.3d at 319.

In support of their Motion, Plaintiffs purport to identify twenty four (24) questions that they claim as "issues of fact and law which are common and typical of Plaintiffs claims

and the class[.]" (ECF No. 195 at 12-13.) None of these questions, however, demonstrates that all class members are "advancing the same legal and factual arguments," *Broussard*, 155 F.3d at 340, or present the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. *Dukes*, 564 U.S. at 350. For instance, the first three of Plaintiffs' proposed common questions, which relate to Columbia's obligations to acquire rights under "FERC Certificates," is not common to the entire class because the twelve fields at issue are operated pursuant to twelve different FERC Certificates issued over decades to various Columbia predecessors, and contain numerous amendments. This disparate factual underpinning means that Columbia's obligations under the FERC Certificates cannot be resolved classwide in a single stroke.

Similarly, while Plaintiffs' proposed common questions four through eight—which relate to Plaintiffs' trespass and inverse-condemnation claims—all require evaluation of Columbia's entry onto the properties, or communication with the owners or their predecessors. The record demonstrates that in the Ripley storage field, for instance, large tracts of land were divided up unevenly over the last century—often in pieces, with the surface rights separated from the mineral rights—and often separately re-sold, passed down, and further divided or combined. Plaintiffs failed to demonstrate how resolution of these questions on a representative parcel or group of parcels would drive the litigation by generating common answers; to the contrary, individualized factfinding will be a complex inquiry that will involve individualized factfinding regarding the chain of title on a parcel-by-parcel basis and may necessitate interpretation of instruments requiring legal conclusions by the Court in this case. Because answering this question as to one parcel, or even a group of parcels, will not provide a class wide resolution or otherwise advance

this litigation across the putative class, it is not a common question. *See Dukes*, 564 U.S. at 351-52.

Plaintiffs' proposed common questions nine through nineteen are merely restatements of Plaintiffs' claims that seek determination of Columbia's liability, and Plaintiffs' entitlement to damages and declaratory relief. At best, these questions merely indicate that all members of the proposed class are proceeding on common legal theories, and the U.S. Supreme Court has stated that the commonality element of Rule 23(a) is not satisfied by the mere assertion of a common legal theory. *See Dukes,* 564 U.S. at 349-50; *see also Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 644 (6th Cir. 2006) (holding that "the issue of whether the Defendant violated Title VII" does not satisfy the commonality requirement).

Plaintiffs' proposed common question twenty asks whether "Columbia Pipeline Group, Inc." is an "alter ego" of its subsidiary "Columbia Gas Transmission, LLC," and therefore responsible for the former entity's alleged liability. (ECF No. 204 at 48.) Plaintiffs have wholly failed to demonstrate how determination of this legal question would drive the resolution of the litigation—particularly when Plaintiffs have no veil-piercing or similar claim that would make the answer relevant to the advancement of this litigation. *Dukes,* 564 U.S. at 350.

Finally, Plaintiffs' proposed common questions twenty through twenty-four relate to Columbia's culpability—specifically, whether Columbia's conduct was "knowing," "intentional," or "fraudulent," and whether Plaintiffs are entitled to punitive damages. Notably, Plaintiffs have no fraud-based claim in this action. To the extent the intent of Columbia is relevant to the issue of damages, Plaintiffs failed to demonstrate how this question would lend itself to being resolved classwide in a single stroke. To the contrary,

the record shows that gas-storage operations in the twelve West Virginia storage fields at issue occurred during disparate periods of time, by disparate predecessors. Without more, the Court is inclined to agree with Defendants that Columbia's subjective understanding of its rights with respect to each parcel at issue would necessarily require a fact-specific inquiry.

In sum, Plaintiffs' proposed common questions transparently avoid the glaring dissimilarities within the proposed class that "will impede the generation of common answers." *Dukes*, 564 U.S. at 350. Plaintiffs make no attempt to show commonality for the title questions among the class: there is no reference to a shared issue affecting title, a common deed, or anything else which could establish commonality. Without more, the record does not show that the individualized inquiries and legal determinations necessary to answer the questions raised by Plaintiffs in this case would be efficiently driven by a class-action format, and Plaintiffs have simply failed to demonstrate the requisite commonality element of Rule 23(a)(2).

### iii.  Typicality

The third element Plaintiffs must prove is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Given the numerous individualized inquiries described above, the claims and defenses of the named Plaintiffs in this case will not be typical of those of the class, because one holder of certain rights to a parcel of property is not reliable to prove the claims of another—even as to the same parcel, where surface and mineral rights have been divided. Thus, numerous federal courts analyzing putative class action cases involving real property and title issues have found that the typicality element did not support class certification. *See, e.g., Valenzuela v. Union Pac. R. R. Co.*, 2017 WL 679095, *8 (D. Ariz.

Feb. 21,2017) (typicality not met due to "complex and unique" factual and legal issues relating to title); *Kirkman v. N.C. R.R.*, 220 F.R.D. 49, 53 (M.D. N.C. Jan. 6, 2004) ("Because of the individual property interest questions involved in this lawsuit, the common issue of whether the Defendants had the right to install cable makes it difficult for any individual plaintiff to establish that his claims are typical of any other plaintiff's claims.").

A finding of typicality is further precluded because Defendants' affirmative defenses turn on parcel-specific facts that do not lend themselves to representation  by a typical plaintiff. Courts have recognized that where critical affirmative defenses turn on these types of plaintiff specific facts, no one class representative can be typical of the class. *See Valenzuela*, 2017 WL 679095, at *4-8 (finding typicality requirement not met where issues of ownership, application of centerline presumption, notice and potential for affirmative defenses were "simply too varied" for the class representatives to represent the potential class members).

The same result is required here, because the necessary differences between the proof of the various putative class members' claims and Columbia's defenses so overwhelm the "common issues" as to make it unlikely that any individual or group of individuals could have claims "typical" of the class. This fact is exemplified by the unique issues identified above with respect to certain named Plaintiffs: (1) named-Plaintiffs Roderick Parsons and Jacob Somerville's properties are subject to prior storage leases which precludes their participation in Plaintiffs' proposed class definition; (2) named Plaintiffs Greathouses, Cunninghams, and Fields own property via grant under which storage rights were excepted from the transfer, such that they could not grant Columbia storage rights even if they wanted to – and thus have no standing to bring any of the

claims in the Amended Complaint; (3) Bruce Cunningham, Joe and Belinda Cunningham, and the Greathouses, who purport to own mineral interests within storage field boundaries own those interests subject to existing oil and gas leases granting broad production and storage rights to third parties to this action, raising questions of standing or, at least, actual or constructive notice of their claims; and (4) the Moles, and Chapman and Tignor each have highly individualized personal knowledge of Columbia's storage activities in the region or on their properties, along with documents in their chains of title referencing storage and placing them on at least record or constructive notice of storage operations.

Beyond the problems posed by complex title and property rights questions, there are other obvious differences between the named Plaintiffs and the putative class they seek to represent. First, None of the named plaintiffs allege to own property in the "buffer" or protective area surrounding the reservoir of Columbia's storage fields under the FERC certificate. (*See* ECF No. 45.) However, Plaintiff's own expert, Ms. Wright, opined that parcels located in these "buffer" areas make up the vast majority of the parcels she identified. *See* Wright Report, at 21 (identifying 1396 parcels in the protective area surrounding the storage-field reservoirs and only 100 parcels within the reservoir area). Just as concerning, Plaintiffs propose to represent individuals with property in twelve different storage fields, yet they only have representatives purporting to own property within the Ripley and Hunt fields. Plaintiffs have not identified putative class members in the remaining ten fields. The fields vary greatly in geography, geology, and capacity, as well as having differences in when they have been in operation and whether changes have been made to their certificated boundaries.

In sum, the widely varied ownership, use, and classification of the parcels at issue, as well as the affirmative defenses available to Defendants with respect to these parcels, are "simply too varied" for the class representatives to represent the potential class members. *Valenzuela*, 2017 WL 679095, at *4-8. Without more, Plaintiffs have failed to demonstrate the requisite typicality element of their claims in reference to the putative class under Rule 23(a)(3).

iv.   <u>Adequacy</u>

Plaintiffs must demonstrate that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). When the claims of the named plaintiffs are "not sufficiently typical of the class claims," the named plaintiffs cannot adequately represent the class. *Valenzuela*, 2017 WL 679095 at *8. First, Plaintiffs fail to meet the adequacy requirement because the claims of the named Plaintiffs are not typical, as described above.

The named class representatives purporting to own mineral interests and bring native gas claims are further inadequate because their interests potentially conflict with the interests of the absent class members they seek to represent. There are conflicts inherent between mineral owners – some owners may have parcels with actual valuable oil and gas and some may own property with unproductive formations. Similarly, storage of gas may not be uniform across depleted formations. Plaintiffs' damage model does not account for this difference. Plaintiffs' own experts admitted this. *See* Burgoyne Dep., at 56:4-57:12, 80:15-17; Reineke Dep., at 27:4-29:19, 32:24-33:5, 37:8-38:18.

To attempt to apply a uniform damages formula to these native gas claims, would, as the Fifth Circuit held, "necessarily yield a windfall to some landowners at the expense of others." *Corley v. Orangefield Indep. Sch. Dist.*, 152 Fed. Appx. 350, 355 (5th Cir.

2005). This conflict is exemplified by named Plaintiff Chapman's testimony that she believes damages should be the same for all oil and gas owners "whether you have more gas or less under your property." *See* Chapman Dep., at 41:25-42:15. Because there are potential conflicts among the named Plaintiff and putative class members with respect to native gas, Plaintiffs have failed to demonstrate that the representative parties will fairly and adequately protect the interests of the class.

> 2.  Step Two: Rule 23(b) Elements

In addition to satisfying the elements of Rule 23(a), here Plaintiffs must also satisfy at least one of the certification requirements under Rule 23(b). *Gunnells*, 348 F.3d at 449.

> i.  Rule 23(b)(1)

Plaintiffs argue that the proposed class satisfies Rule 23(b)(1) "because prosecuting separate actions would create a risk of inconsistent decisions that would establish incompatible standards for the defendant, or a risk of decisions that would be dispositive of the claims of other class members. (ECF No. 195 at 38 (citing Fed. R. Civ. P. 23(b)(1).)

In response, Defendants assert that "there is no risk of separate actions being dispositive of other putative class members' claims . . . [because] the claims and defenses of the parties are so individualized that separate mini trials will be necessary to determine their rights." (ECF No. 204 at 50.) Additionally, Columbia argues that Rule 23(b)(1) covers cases in which separate actions by or against individual class members would risk establishing "incompatible standards of conduct for the party opposing the class," or would "as a practical matter be dispositive of the interests" of nonparty class members." (ECF No. 204 at 49.) Rule 23(b)(1)(A) "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government

imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." (ECF No. 204 at 49-50 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).) The Court agrees with Columbia that the risk of creating incompatible standards is not akin to cases illustrated by the U.S. Supreme Court in *Anchem Products, Inc.*

### ii.    Rule 23(b)(2)

Plaintiffs argue that they have satisfied Rule 23(b)(2) because their "claims for equitable relief are on behalf of all class members" and "[t]here is no need to address any individual issues to grant this relief" because Columbia knows "exactly what properties are affected because they mapped the extent of their leases." (ECF Nos. 195 at 39, 209 at 20.)

The same consideration discussed throughout this analysis is present on this issue as well. Identification of the *parcels*, standing alone, does not identify the *owners* of those parcels or, where applicable, the owners of mineral rights with respect to those parcels. Given the varying properties interests, the Court agrees with Columbia that the Rule 23(b)(2) "cohesiveness" requirement is not met because Plaintiffs' claims – including the requests for declaratory and injunctive relief – require individualized title determinations. (ECF No. 204 at 50) (citing *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 635-36 (W.D. Wash. 2011) ("cohesiveness is lacking where individual issues predominate" and "a class under Rule 23(b)(2) must not be overrun with individual issues").)

### iii.    Rule 23(b)(3)

Plaintiffs have also failed to satisfy the predominance and superiority elements of Rule 23(b)(3). Certification pursuant to this Rule depends upon the Court's finding "that

the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citations omitted; alternation in original). The predominance requirement ensures that a class is "sufficiently cohesive to warrant adjudication by representation." *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). The predominance requirement "is far more demanding than Rule 23(a)'s commonality requirement." *Gariety*, 368 F.3d at 362 (internal quotes omitted). To determine whether common issues predominate over individual issues, the court must take a "close look" at the claims and defenses at issue. *Id.* at 365; *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996). The court cannot "rely on assurances of counsel that any problems with predominance or superiority can be overcome." *Id.* at 742.

In the case at hand, the Court agrees with Defendants that individual issues predominate over any common questions that may exist as to the class, such that a class action is not superior in the efficient adjudication of the controversy. The core problem with Plaintiffs' position is that each of their claims incorporate some requirement of predicate ownership or right to possession of the property. An individual title examination and determination by the trier of fact will be needed for each property to

determine who owned which rights and when, and whether at any point during the operation of the relevant storage field the property was subject to a document excepting or granting the right to store. Such an individualized inquiry into every parcel within each of Columbia's storage fields will overwhelm the possibility of any common issues. *See In re SFPP Right-Of-Way Claims*, 2017 U.S. Dist. LEXIS 85973, *40 (C.D. Cal. May 23, 2017) (common issues did not predominate where ownership issues required resolution for trespass, inverse condemnation, and unjust enrichment); *Kirkman v. N.C. R.R.*, 220 F.R.D. 49, 54 (M.D. N.C. Jan. 6, 2004) (same); *McDaniel v. Qwest Communs. Corp.*, 2006 U.S. Dist. LEXIS 37066, *5 (N.D. Ill. May 23, 2006) (trespass and unjust enrichment require "highly individualized inquiry as to the relative property interests of each putative class member"); *Schillinger v. 360 Networks Corp.*, 2007 WL 9636771, at *4 (S.D. Ill. Sept. 27, 2007) (trespass "will require the Court to examine the chains of title for every relevant parcel . . . to determine whether each class member actually owns an interest").

The ownership questions at the center of this action make it impossible for the class to "prevail or fail in unison." *See Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). As explained in the report of K. Monroe, Defendants' expert on oil and gas title issues in West Virginia, "each parcel of real property in West Virginia will have its own unique chain of title that differs from all other parcels." *See* Monroe Report. The examination of oil and gas title in West Virginia is complicated because oil and gas was frequently severed from the surface in the late 1800's and early 1900's. *See id*. At the time of these oil and gas severances, many farms were large and included hundreds of acres. Therefore, the surface ownership and the oil and gas ownership have two separate and distinct chains of title. *Id*. Additionally, where the oil and gas have been severed, the

current surface tax map and parcel designations do not align with the original boundaries of the oil and gas tracts. It is often difficult to align the current surface parcels to the underlying mineral tracts. *Id.*

Not only is the inefficiency of such a task on a classwide basis apparent on its face, but absent threshold resolution of these ownership issues to clarify the class and permit appropriate notice, the matter cannot be fairly adjudicated on a class basis. When a party seeks certification under Rule 23(b)(3), "the court must direct to class members the *best notice* that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2) (emphasis added). Such notice is required for a 23(b)(3) class so that class members have the opportunity to opt out and pursue their claims separately. *See* Fed. R. Civ. P. 23(c)(3)(B); *Melton*, 283 F.R.D. at 299. The Supreme Court has long held that, in a class action brought under Rule 23(b)(3), individual notice to identifiable class members is not a "discretionary consideration" to be waived in a particular case, nor may notice requirements be tailored to fit "pocketbooks of particular plaintiffs." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 175–76 (1974).

As set forth above, Plaintiffs' attempt to rely on dated Columbia records and Ms. Wright's GIS mapping is unsuccessful because the data informing Ms. Wright's opinion is unreliable; as a result, the parcels she identified, without more, would not provide the "best notice" possible. The U.S. District Court for the District of South Carolina recently rejected a similar method. *See Melton* 283 F.R.D. at 299. In that case, plaintiffs sought to certify a class of "[a]ll owners of real property in South Carolina over and/or under which" defendant had transmission easements in which defendant had constructed fiber optic lines. *Id.* at 285–86. Whereas defendant argued that full title searches were necessary to

identify the true owner of each adjoining parcel, plaintiffs argued that "a map of Defendant's fiber optic system could be overlaid across a county tax map, and the owners of the property encumbered by that fiber optic system could then be obtained from the county tax records." *Id.* at 298. The court rejected plaintiffs' argument, reasoning that tax records do not capture "the ownership of heirs and devisees," "parties claiming an interest by adverse possession," and "areas of disputed ownership," "and they could incorrectly show receivers of false conveyances as true owners." *Id.* at 299.

Plaintiffs in this case do not even purport to rely on tax records, and instead propose to identify class members based purely on the unreliable GIS maps; for this reason, the Court finds that Plaintiffs have failed to comply with their Rule 23(b)(3) notice obligations, and like *Melton,* Plaintiffs' attempt to certify a class cannot succeed where it is clear individual issues of property ownership will predominate.

### 3.    Ascertainability Pursuant to Rule 23(c)(1)(B)

Finally, the Court addresses whether the class is ascertainable so that an order certifying a class action can "define the class" as required pursuant to Rule 23(c)(1)(B). As Defendants pointed out in citing to a recent Fourth Circuit case, while "[t]he plaintiffs need not be able to identify every class member at the time of certification," a class action is nonetheless "inappropriate . . . if the class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.'" *EQT Production Co. v. Adair,* 764 F.3d 347, 420 (4th Cir. 2014) (citing *Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579-80 (1st Cir. 1986)). This is especially true where a proposed class definition involves an analysis of title or land records. *See e.g., Johnson v. Kan. City S.*, 224 F.R.D. 382, 389 (S.D. Miss. 2004) (denying certification on ascertainability grounds when determining class membership "would require individualized review of title documents containing

differing and diverse conveyance language"), *aff'd sub nom.*, 208 F. App'x 292, 297 (5th Cir. 2006)).

As the Court discussed *above* in its discussion of Defendant's *Motion to Strike*, incorporated herein, the class is not readily ascertainable. Here, just as in *Johnson*, Plaintiffs' proposed class definition involves an initial threshold analysis of title or land records, or other objective data to confirm (1) whether each plaintiff owns a real property interest in a parcel, by surface ownership and/or subsurface mineral/gas rights; (2) whether any other party holds an ownership interest; (3) the parcel to which the ownership or right(s) apply sits within the boundary of one of the twelve Columbia storage fields in West Virginia that has been certified by the FERC; and (4) whether the parcel is subject to a lease, easement, deed, court order, or other instrument granting storage rights to Columbia (or one of its predecessors). As Defendants illustrated, record evidence in the form of lease agreements and land deeds raises these threshold issues even with respect to named Plaintiffs Roderick Parsons, Jacob Somerville, Kelvin Greathouse, Kay Greathouse, Jerry Cunningham, Belinda Cunningham, and Annetta Fields—*more than half* of the twelve remaining named Plaintiffs. (*See* ECF Nos. 204 at 25, 204-8, 204-10, 204-12.)

Furthermore, Plaintiffs have not proposed a reliable methodology or process for accurately ascertaining the putative class members. As set forth above, the documents and data relied upon by Plaintiffs' GIS expert, Ms. Wright, help identify a universe of possible claimants based upon her correlation of tax maps to Columbia's field storage

maps; however, the maps lacked indicia of reliability necessary to accurately identify members of Plaintiffs' putative class without taking substantial additional steps.[7]

The Court further notes that Plaintiffs have not offered language that would enable notice to putative class members should class certification be granted; nor have Plaintiffs satisfied the Court that the proposed class would sufficiently protect the due-process rights of all the parcel owners. Because Plaintiffs were unable to point to a reliable mechanism for determining whether putative class members fall within the class definition, the Court finds that Plaintiffs have failed to demonstrate the requisite ascertainability element; without more, a class action is simply inappropriate under the circumstances. *Adair*, 764 F.3d at 358.

### 4.   Issue Certification Pursuant to Rule 23(c)(4)

Lastly, Plaintiffs argue that "this Court also has the option of certifying an issue class under Rule 23(c)(4)." (ECF No. 195 at 46.) This Rule permits an action to be brought or maintained as a class action, when appropriate, with respect to particular issues. Fed. R. Civ. P. 23(c)(4). Plaintiffs pointed to well-settled authority finding that though full class certification may not be appropriate when individualized damage determinations are required, Rule 23(c)(4) can nonetheless permit class adjudication as to other issues such as liability. *Id*. at 48 (collecting cases). Plaintiffs assert that "there are many issues worthy of this Court's class consideration, regardless of its ultimate decision on the proposed certification of the class, itself." *Id.*

---

[7] In a near-identical case involving the same counsel in this consolidated action, the Western District of Pennsylvania found that mini trials would be needed to determine native gas ownership. *Asbury v. EQT Corporation*, No. 2:18-cv-01005-CB (W.D. Pa. Sept. 29, 2021). While the district court in *Asbury* granted class certification as to surface owners, the Third Circuit Court of Appeals reversed this decision and remanded back to the district court for further analysis. *See id.*

As Defendants point out, however, to proceed on issue certification, the plaintiffs must still demonstrate, among other things, the typicality and adequacy elements. *See Valentino v. Carter- Wallace, Inc.*, 97 F.3d 1227, 1230, 1234 (9th Cir. 1996) (reversing issue certification for failure to prove typicality, adequacy, predominance, and superiority). As set forth above, Plaintiffs have failed to do so, and their passing reference to Rule 23(c)(4) fails to demonstrate that certification of a specific issue would alter the application of those elements.

Moreover, the Court finds that two additional considerations raised by the Defendants are persuasive. First, the class-identification issues described above present "serious due process concerns about whether adequate notice can be given to all class members," as required. *Valentino*, 97 F.3d at 1234. Finally, any issue class would not "materially advance the disposition of the litigation as a whole" *see Valentino*, 97 F.3d at 1229, and even if there was an issue class, the "sheer number of issues left for the individual stage of the litigation is emblematic of the futility of issue certification." *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 169 (S.D.N.Y. 2003); *see also Parker*, 2015 WL 127930, at *15 ("to allow this case to proceed as a class action for certain simply and relatively straightforward common threshold issues would be to allow the tail to wag the dog," and "illustrates [] why issue certification authorized by Rule 23(c)(4) is little used"). In short, highly individualized mini-trials would still be required, and as such certification under Rule 23(c)(4) is not proper.

*IV.*

For the foregoing reasons, **IT IS ORDERED** as follows:

(1)     Plaintiffs' *Motion to Certify Class Action* (ECF No. 194) is **DENIED**;

(2)     Defendants' *Motion to Strike Plaintiffs' Expert* (ECF No. 202) is **DENIED**;

and

(3)     Within 45 days of entry of this Memorandum Opinion and Order, which is

**November 14, 2022**, the parties shall submit a Joint Status Report setting

forth each party's statement of issues remaining for determination, as well

as a joint proposed case schedule; alternatively, in the event an appeal to

the U.S. Circuit Court of Appeals for the Fourth Circuit is filed by one or

more of the parties, the Joint Status Report shall state the parties' positions

as to whether a stay is appropriate during the pendency of such appeal.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk of Court to send a copy of this Order to counsel of

record and to any unrepresented party.

ENTER:      September 30, 2022

Dwane L. Tinsley
United States Magistrate Judge